In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2479

SMS DEMAG AKTIENGESELLSCHAFT,

*Plaintiff,*

*v.*

MATERIAL SCIENCES CORPORATION,

*Defendant-Appellee.*

APPEAL OF: TERRONICS DEVELOPMENT CORPORATION,

*Intervenor-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 2:06-cv-02065—**Michael P. McCuskey**, *Chief Judge*.

ARGUED DECEMBER 12, 2008—DECIDED MAY 8, 2009

Before CUDAHY, FLAUM, and WOOD, *Circuit Judges.*

CUDAHY, *Circuit Judge.* In this diversity action, Terronics Development Corporation (TDC) sues Material Sciences Corporation (MSC) for breach of contract, seeking

damages and the return of certain patents TDC had assigned to MSC. The district court granted MSC's motion for summary judgment in its entirety. We affirm the dismissal of TDC's damages claims, but reverse the dismissal of TDC's claim seeking the reassignment of its patents.

## I.

MSC is one of the largest liquid coating companies in North America. It pre-paints the raw materials that are used by commercial and industrial manufacturers in cars, building supplies, industrial equipment and consumer products. Beginning in the 1990s, MSC began working with TDC—a small research and engineering company—to develop a new process for coating metal materials using powder-based paint. Like traditional powder coating methods, TDC's process—which the parties call the "Powder Cloud" process—involves electrostatically coating sheet metal by imparting different electric charges to the powder paint and the metal substrate. Also like other powder coating methods, the Powder Cloud process wastes less coating material than traditional, liquid coating methods and eliminates the need for solvents, thus minimizing the generation of hazardous waste. TDC's Powder Cloud process was apparently innovative because it enabled a single apparatus to coat products of different shapes, and to coat both sides of a metal surface simultaneously. As a result, TDC's Powder Cloud technology seemed to promise both greater flexibility and faster processing than traditional powder coating processes.

In 1994, TDC granted MSC an exclusive license to use and sublicense the Powder Cloud technology in exchange for a fixed annual fee plus a variable fee based on MSC's sales. The parties renewed their licensing agreement in 1996, and TDC assigned its technology for a fixed term to MSC in 1998. It is this third "technology assignment" agreement (henceforth the Agreement) that is at issue here. The Agreement was never formally executed, but MSC concedes for the purpose of this appeal that the agreement is enforceable. Four provisions of the Agreement are worth mentioning at the outset: (1) TDC assigned MSC title to five patents and six patent applications relating to the Powder Cloud process; (2) MSC was required to purchase its powder coating equipment from TDC unless TDC was unable to provide it; (3) MSC agreed to purchase a fixed minimum amount of consulting services and equipment from TDC during the years the Agreement was in effect; and (4) the agreement would expire in 2002, but could be renewed at MSC's discretion and would be renewed automatically if certain sales goals were met.

In 1996, MSC sublicensed the Powder Cloud technology to SMS Demag Aktiengesellschaft (SMS), giving SMS the exclusive right to market this technology outside of North America.[1] After this initial success, however, the commercialization of the Powder Cloud technology did not proceed as the parties had expected. For one thing, MSC

---

[1] SMS was the original plaintiff in this action, but is not a party to this appeal.

did not meet any of the sales goals that would have triggered the Agreement's automatic renewal or variable fee provisions. Further, because the technology was a great deal more experimental than the parties had anticipated, TDC experienced significant cost overruns in supplying the equipment and services MSC needed. (As TDC's CEO Ed Escallon would later remark, "[t]he Hubble's optics weren't correct on launch.") In 1996 and again in 1997, TDC chose to meet these cost overruns by borrowing against its expectation of future profits, executing two promissory notes in favor of MSC—the second superseding the first—for a total of $258,484 together with a 7% annual rate of interest. Under the terms of the second Note, MSC was permitted "at its sole discretion" to credit the fees due to TDC under the Agreement against the outstanding balance under the Note after April 2001.

It appears that by 1998, MSC began having serious second thoughts about its commitment to the Powder Cloud technology. Company records indicate that as a result of "overcapacity" and "lower than expected sales," MSC decided to merge its "applied technology group," which had been responsible for commercializing the Powder Cloud technology, into its liquid coating division. In addition, MSC postponed plans to construct a stand-alone powder coating facility, electing instead to add a powder coating line to an existing, liquid coating facility in Middletown, Ohio. The parties refer to this Middletown facility as "Line 15." TDC elected not to supply MSC with the equipment for Line 15.

The parties' relationship came to an unpleasant end in 2002. In late 2001, Ed Escallon sent MSC a letter purporting to memorialize an oral agreement providing for MSC to cancel $100,000 of TDC's debt under the Note. Escallon's letter stated that MSC agreed to forgive this debt to compensate TDC after MSC elected not to purchase its equipment for Line 15 from TDC. MSC did not respond to Escallon's letter. In April 2002, MSC sent TDC a letter informing it that MSC was exercising its right under the Note to credit the $250,000 technology assignment fee MSC owed TDC for 2002 against the balance of the Note, which at the time was about $350,000. Finally, in May 2002, TDC sent MSC a letter notifying it that it would "no longer provid[e] support to MSC activities."

SMS, the original sub-licensee for the Powder Cloud technology, commenced this action against MSC in federal district court. TDC intervened, adding its own breach of contract claim seeking $2,153,400 in damages as well as the reassignment of four of its patents. MSC counterclaimed against TDC for $103,843.52, based on the outstanding balance on the Note as well as the cost of the repair work for which TDC was paid but failed to perform. The district court granted MSC's motion for summary judgment in its entirety, dismissing TDC's damages and equitable claims and granting judgment for MSC on its counterclaims. On this appeal, TDC has challenged only the dismissal of its claims.

## II.

Summary judgment is appropriate when there are no genuine factual disputes that require a trial. *See* Fed. R. Civ.

P. 56(c); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In evaluating a motion for summary judgment, courts must view the evidence in the light most favorable to the non-moving party. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). However, before a non-movant can benefit from a favorable view of the evidence, it must show that there is some genuine evidentiary dispute. "Genuine," in this context, means "reasonably contestable." *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997). Put otherwise, a factual dispute is "genuine" only if a reasonable jury could find for either party. *Reeves*, 530 U.S. at 148; *de la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 685 (7th Cir. 2008).

In the present case, TDC sought an order compelling MSC to reassign TDC's patents as well as approximately $2.15 million in damages. TDC's damages claim was comprised of three sub-claims: (1) $250,000, which TDC alleges it was owed as an "assignment fee" for 2002; (2) $143,400, which was the amount of consulting services and equipment MSC was required to purchase from TDC in 2002; and (3) $1,760,000, which represents the fees TDC would have been due from 2003 to 2006 if the Agreement had been renewed.

The district court granted summary judgment for MSC on all of TDC's claims. We review this decision *de novo*. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 685 (7th Cir. 2008). Under the terms of the Agreement, Illinois law controls. We will consider TDC's claims in reverse order.

## A.

$1.76 million of TDC's claimed damages represents the money it would have been owed if the Agreement had been renewed. By its terms, the Agreement ran from April 1998 to April 2002. MSC was empowered to renew the Agreement for an additional four-year term "at its sole discretion." While there is no dispute that MSC did not expressly renew the Agreement, TDC argues that MSC renewed the agreement implicitly "by performance." TDC makes two allegations in support of this claim: first, it alleges that MSC extended SMS's sub-license in 2004; second, it claims that MSC continued to market the Powder Cloud technology after the Agreement had lapsed.

As to the first allegation, there is no evidence that MSC affirmatively "extended" SMS's sub-license after 2002. Indeed, the copy of the sub-licensing agreement that was made part of the record on appeal shows that MSC had no need to "extend" the sub-license because the sub-license would be renewed automatically until it was cancelled. Nor was MSC required to terminate the sub-license in 2002, when TDC repudiated the Agreement. Section 10.6(a) of the Agreement provides that the expiration or non-renewal of the Agreement would have no effect on existing sub-licenses.

There is also no evidence to support TDC's allegation that MSC implicitly renewed the Agreement by continuing to market TDC's technology after 2002. TDC points to what appears to be a printout from a 2004 trade publication, which it submitted in opposition to MSC's

motion for summary judgment, but which it did not authenticate. Even if we were to assume that the printout is what it purports to be, the printout lends no support to TDC's cause. The publication describes, among other things, how MSC worked with TDC to develop a powder coating system, how MSC's application process "uses several patented elements to achieve . . . high-speed capabilities" and how MSC continues to attempt to find markets for coated products. Assuming that this publication is authentic, it does not suggest that MSC was continuing to exploit the specific patents that TDC had assigned to MSC through the Agreement.

The non-moving party is entitled to have only *reasonable* inferences drawn in its favor. *See Omosegbon v. Wells*, 335 F.3d 668, 677 (7th Cir. 2003). In the present case, even if MSC had continued to use its equipment to make and sell powder-coated steel products, as the publication indicates, there is no evidence to suggest—and it would be unreasonable to infer—that MSC was infringing on TDC's patents in order to do so. Section 10.2 of the Agreement requires MSC to stop manufacturing and selling TDC's equipment to others after the Agreement expires; it does not require it to stop using equipment it had already paid for to manufacture powder-coated products to sell to third parties.

In short, there is no genuine issue of fact as to whether MSC renewed the Agreement. Accordingly, the summary dismissal of TDC's claim for fees from 2003 to 2006 was proper.

**B.**

TDC's claim for $143,400 in damages based on the consulting services and equipment that MSC was required to purchase in 2002 is equally without merit. Section 4.4 of the Agreement provides that "MSC will guarantee minimum annual spending with [TDC] to provide consulting services, equipment and engineering for the non-renewable term of the agreement." Specifically, MSC was required to purchase $143,360 in services and equipment from TDC in 2002. However, in May 2002, TDC sent MSC a letter declaring that it was "no longer providing support to MSC activities." Under Illinois law, "in the face of clear evidence of an intent to repudiate, the non-repudiating party is no longer under an obligation to perform." *In re C & S Grain Co.*, 47 F.3d 233, 237 (7th Cir. 1995) (citing *Builder's Concrete Co. v. Fred Faubel & Sons, Inc.*, 373 N.E.2d 863, 868 (Ill. App. Ct. 3d Dist. 1978)). After TDC declared its unwillingness to perform under the Agreement, it was quite clearly not entitled to payments it would otherwise have been due under the Agreement.

Indeed, even if MSC had been the first party to breach the Agreement—as we discuss below, it was not—TDC's complete repudiation of the Agreement would have relieved MSC of its obligation to attempt to purchase the equipment and services TDC declared itself unwilling to provide. *See Ahern v. Knecht*, 563 N.E.2d 787, 792 (Ill. App. Ct. 2d Dist. 1990) ("[S]ubstantial nonperformance . . . warrants rescission.").

**C.**

The final portion of TDC's damages claim is for $250,000, which represents the "guaranteed minimum fixed fee" TDC alleges it is still owed for 2002. Section 3.1 of the Agreement calls for MSC to pay TDC a fixed fee of $250,000 by April 2002. However, in 1997, TDC borrowed $258,484 from MSC to cover its cost overruns. By April 2002, the balance under the Note was $349,773. And on April 9, 2002, MSC gave TDC written notice of its decision to "exercise its discretion [to] credit the Guaranteed Minimum (Fixed) Fees of $250,000 due under our license agreement for this year against the outstanding balance [under the Note]." The Note provides that "[a]fter April 1st 2001, MSC may at its sole discretion credit minimum fees due for that year to any remaining outstanding balance." Thus, MSC's decision to credit the $250,000 it owed TDC for 2002 against the balance under the Note was entirely proper.

As best we can tell, TDC has affirmatively waived its claim that it is still owed the full $250,000 fee, admitting that it "may have erred in the amount [it had originally] demanded." (TDC Br. at 12.) However, TDC continues to argue that it is still owed $100,000 of this $250,000 license fee. Unfortunately, TDC's account of why it is still owed this money is almost completely incomprehensible. In its appellate brief, TDC suggests that it was owed this money for "consulting services" under Sections 6.4 and 6.5 of the Agreement. But there is nothing in Sections 6.4 or 6.5—or anywhere else in the Agreement—that validates TDC's claim that it is owed

this specific amount; the pleadings give the impression that TDC made this number up out of whole cloth.

Even more puzzling than this is the fact that TDC claims that this alleged $100,000 debt is related to MSC's construction of Line 15. It is undisputed that TDC elected *not* to supply equipment for Line 15. As TDC's CEO Ed Escallon would later explain, "[TDC] had some important market opportunities in designing and building equipment unrelated to MSC, and did not want to forgo them." Thus, even though TDC had the right to supply MSC with equipment, it waived this right, which under the terms of the Agreement left MSC free to supply Line 15 as it saw fit.

TDC's claim becomes slightly more intelligible—but only slightly—when considered in the context of Escallon's October 2001 letter to MSC. In his letter, Escallon states that in April 1999, TDC granted MSC a license to build Line 15 without TDC's help in exchange for "closing out the first 100,000 dollar note." This was apparently an oral agreement. Indeed, when Escallon invited MSC to formally execute this alleged agreement years later, MSC refused. Thus, even if there were evidence of this alleged oral agreement, the agreement would be invalid under Illinois's version of the Uniform Commercial Code, which requires that cancellation of a Note must be *in writing*. *See* 810 Ill. Comp. Stat. § 5/3-604(a).[2]

---

[2] There is no merit to TDC's argument that MSC is estopped from relying on the U.C.C. because it failed to plead the U.C.C.

(continued...)

However, even if Escallon had alleged merely that MSC had made an oral promise to pay TDC $100,000—instead of alleging that MSC orally promised to forgive a portion of the Note—summary judgment for MSC still would have been proper. The principal problem with TDC's claim is that there is no evidence that MSC ever promised TDC anything. Contrary to TDC's claims to the contrary, Escallon's statements that he was promised $100,000 is not evidence. *See de la Rama*, 541 F.3d at 685 (bare allegations insufficient to defeat a motion for summary judgment); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) (bald assertions do not give rise to genuine issues of fact); *McDonnell v. Cournia*, 990 F.2d 963, 969 (7th Cir. 1993) (self-serving assertions without more will not defeat a motion for summary judgment).

---

[2] (...continued)

as an affirmative defense in its answer. TDC's second amended complaint gave no notice of a separate claim for $100,000 based on this alleged oral agreement. Nor did TDC object to MSC's invocation of the U.C.C. below.

Nor, for that matter, is there any merit to TDC's argument that this U.C.C. provision does not apply here because MSC cancelled only a portion of TDC's debt. The statute does not distinguish between total and partial discharge of a party's obligations under a Note. During oral argument, TDC's attorney was not able to point to any authority for its claim that the statute should be read to apply only to a total discharge of a debt.

TDC attempts to avoid this conclusion by relying on Illinois's doctrine of "past performance." Under this doctrine, performance under an oral agreement can render such an agreement enforceable. *See Meyer v. Logue*, 427 N.E.2d 1253, 1256 (Ill. App. Ct. 1st Dist. 1981); *Hills v. Hopp*, 122 N.E. 510, 512 (Ill. 1919). TDC argues that the oral agreement called for it to forego its right to supply equipment for Line 15 in exchange for $100,000. (To put this point less charitably, TDC alleges that it was promised $100,000 in exchange for doing nothing.) TDC claims that it lived up to its part of the alleged bargain: it refrained from supplying MSC with equipment. It argues that this "performance," such as it is, is enough to render MSC's alleged oral promise enforceable.

This argument, of course, is unavailing. The justification for the past performance doctrine is at least in part that performance under an oral agreement typically constitutes evidence that there actually *was* an agreement. *See Meyer*, 427 N.E.2d at 1256 ("When one party fully performs his part of the alleged oral contract . . . the courts recognize that this very performance strongly indicates the existence of a contract.") (citing 2 Corbin on Contracts § 430 (1950)); *see also Carl A. Haas Auto. Imports, Inc. v. Lola Card Ltd.*, 933 F. Supp. 1381, 1388 (N.D. Ill. 1996) (noting that the past performance doctrine applies to performance that is "clearly more consistent with the existence of the agreement than with some other arrangement."). Where, as here, the alleged performance costs a party nothing—or where the same party actually benefits from its own alleged "performance"—then this performance is no evidence at all of the existence of the agreement.

In the present case, TDC alleges that it performed by failing to exercise its right to supply equipment for Line 15. However, Escallon admitted that TDC had no interest in supplying the Line 15 equipment because "[TDC] had some important market opportunities in designing and building equipment unrelated to MSC, and did not want to forgo them." He also admitted that TDC actually lost money supplying equipment to MSC.[3] Because TDC admits that it benefitted by forgoing its right to supply equipment to Line 15, neither its "performance" under the alleged oral agreement, nor Escallon's self-serving insistence that there was such an agreement, is enough to give rise to a triable issue concerning whether MSC owes TDC $100,000.

**D.**

While the district court properly granted summary judgment for MSC on TDC's damages claims, it was error for the court to dismiss TDC's claim seeking the reassignment of certain of its patents. Section 10.2 of the Agreement provides that "[i]f this Agreement is terminated

---

[3] The following exchange occurred during MSC's deposition of TDC's CEO: "Question: Now, the minimum consulting fees and engineering fees that you are charging . . . that wasn't all profit, correct? Answer: Oh, my God. That was mostly loss . . . Question: Had you agreed to provide $143,400 worth of services for MSC . . . you're saying your profit would have been 15 to 20%, or a lot less than that? Answer: A lot less. Question: Maybe nothing? Answer: Maybe nothing."

or expires, MSC shall immediately cease manufacturing and selling the Equipment . . . and shall return to [TDC] all the Technology capable of being returned." Section 1.12, in turn, provides that "Technology includes but is not limited to the patents . . . [and] patent applications," which were identified in exhibits to the Agreement. Read together, these provisions required MSC to reassign the patents that were assigned to it under the Agreement when the Agreement was terminated in May 2002.

MSC argues that it is not required to reassign TDC's patents because a different section of the Agreement, section 10.6(b), requires it to reassign the patents "if the agreement is terminated by MSC." This provision does not say that MSC is required to reassign the patents *only if* MSC is the party breaching the Agreement. However, MSC argues that the insertion of this specific provision relating to the patents, in addition to the general provision concerning "technology" reassignment, is evidence that the parties intended to protect TDC's interests if, but only if, MSC was the party in breach.

While this may have been what the parties intended, this is not what they said. Under Illinois's "four corners" rule, if a written agreement is unambiguous, then the scope of the parties' obligations must be determined from the contract language without reference to extrinsic evidence. *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999). Here, by its terms, the Agreement requires MSC to reassign TDC's patents if the Agreement expires. Since these terms are unambiguous, we must enforce the Agreement as written.

Unfortunately, there seems to be some uncertainty as to which patents, precisely, TDC assigned to MSC, and which patents MSC still retains. The Agreement was never formally executed. While the parties concede for the purposes of summary judgment that the Agreement is enforceable, there are two different drafts of the Agreement that were included in the record on appeal. TDC's second amended complaint attaches what appears to be the earlier of the two drafts, which lists five patents and six patent applications that TDC putatively assigned to MSC. However, TDC identifies four *different* patents in its second amended complaint, none of which were transferred to MSC under the draft of the Agreement that TDC attached to its complaint. Further, the record on appeal shows that MSC has abandoned at least five of TDC's patents with TDC's consent, and that a sixth patent has already been reassigned to TDC. Thus, we cannot determine based on this record whether MSC has actually retained title to any of the patents TDC assigned to it, nor can we determine if the patents TDC identifies in its complaint actually ever belonged to TDC.

Although we remand this case for further proceedings, we do so in the expectation that the issues we have identified can be resolved expeditiously. There is factual support for TDC's claim that it assigned MSC title to certain patents in 1998. The sole questions that remain to be determined are: first, which patents did TDC assign to MSC; and second, has MSC retained title to any of these patents. The district court has broad discretion to determine the best method for resolving these questions on remand.

### III.

We affirm the district court's dismissal of TDC's claims for damages, but reverse its dismissal of TDC's equitable claim for the reassignment of its patents and remand for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART
AND REMANDED