# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 10-3490

EDDIE BURNELL, JR.,

*Plaintiff-Appellant,*

*v.*

GATES RUBBER COMPANY,
a foreign corporation,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 08 C 50192—**Frederick J. Kapala**, *Judge.*

ARGUED APRIL 4, 2011—DECIDED JULY 27, 2011

Before KANNE, ROVNER, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* When Eddie Burnell, Jr., received a written warning from his supervisor for failing to complete a task, he went straight to management to complain. To his surprise, the complaint triggered a series of events that led to his discharge from Gates Rubber Company. Burnell then sued his former employer in federal district court, complaining of discrim-

ination in violation of 42 U.S.C. § 1981, as well as dis-criminatory discharge, discriminatory employment actions, and retaliatory discharge, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* The district court granted summary judgment on all counts, and Burnell now appeals that order as to his discriminatory and retaliatory discharge claims and his § 1981 claim. We affirm the grant of summary judgment as to his discriminatory discharge and § 1981 claims, but reverse as to his retaliatory discharge claim.

## I. BACKGROUND

Burnell, an African American, claims race motivated his December 20, 2006, discharge. As evidence for this claim, Burnell alleges several instances of past discrim-ination—mainly during his first stint in Gates Rubber's tool room, from 1993 to 1996. Before describing the events leading to Burnell's discharge, we summarize these allegations.

Many of Burnell's allegations involve white employee Joe Payne, who was rumored to have said that he would rather retire than work with Burnell. Near the beginning of Burnell's time in the tool room, Payne tricked Burnell into being sprayed with a hose. Payne later told Burnell that Burnell would never be allowed to run certain tool room equipment. Burnell alleges a few other instances of racial discrimination during his first stint in the tool room. He claims that employees were trained disproportionately by members of the same race and that other (white) tool room employees

received outside training that he did not receive. Finally, Burnell claims that white employees improperly gave him failing grades on a test to earn a promotion.

At some point, Burnell complained about Payne to plant manager Shahram Totonchian and employee relations specialist Jill Carvalho. Totonchian talked to Burnell's supervisor about Payne, but Burnell was not satisfied with the results. Totonchian also laughed about Payne's threat to retire if he had to work with Burnell. Payne eventually retired, but he was hired back as a temporary employee. Burnell rejoined the tool room in 2003.

On December 18, 2006, supervisor Todd Gates[1] asked Burnell to "turn down"[2] six tools. According to Burnell, Gates prefaced the request with "if you have time." When Gates returned the next morning, he saw the tools in the same place he had left them, and the tools had not been turned down. Gates reported Burnell's apparent insubordination to maintenance manager Doug Krause. When Burnell arrived at work, Gates issued him a written warning. Burnell explained to Gates that he had not had time to turn down the tools, and he did not accept the written warning.

---

[1] We refer to Todd Gates as "Gates" and to Gates Rubber Company as "Gates Rubber."

[2] "Turning down" a tool involves grinding down the shaft of the tool. While the details of the process are not relevant here, we note that improperly turning down a tool may create a serious safety risk.

Instead, Burnell left to complain to Totonchian about the warning. At some point, Krause joined the conversation. Burnell told Totonchian that Gates had left him a note asking him to turn down the tools if he had time. Burnell then claimed he had not had time to turn them down, so the written warning was inappropriate. Later in the conversation, Burnell explained he had felt he could not turn down the tools safely.

After meeting with Burnell, Totonchian and Krause spoke briefly with Gates. Gates reported that he had given Burnell an oral instruction to turn down the tools and that the instruction did not include any suggestion Burnell should do the work only if he had time. He also reported that Payne had successfully turned down the tools upon request.

Totonchian and Krause then met once more with Burnell. Burnell began the meeting by asking for a third party witness, which Totonchian and Krause refused. Though Burnell repeated that he did not turn down the tools because he could not do it safely, he did not describe the steps he had taken to try to turn down the tools safely. At some point, according to Burnell, Totonchian accused Burnell of "playing the race card" and told him to find another job if he did not enjoy working at Gates Rubber. Krause dismissed Burnell from work for the day and instructed him to return the next day with a commitment letter, which is a common disciplinary device at Gates Rubber.

Totonchian was demonstrably upset, and he wanted to fire Burnell for insubordination and lying. Carvalho

convinced Totonchian not to fire Burnell if Burnell would sign a commitment letter. Carvalho then called Burnell, and Burnell claims she approved a commitment letter that he had drafted. But when Burnell met the next day with Krause and human resources manager Cathy Waters, they demanded Burnell sign a different commitment letter. The new letter implied that Burnell had been insubordinate and dishonest. When Burnell repeatedly refused to sign the new letter, Krause and Waters told him he would be fired if he did not sign. Burnell refused again and was fired.

Burnell sued Gates Rubber in federal district court, claiming discriminatory discharge, other discriminatory employment acts, and retaliatory discharge—all in violation of Title VII—and discrimination in violation of 42 U.S.C. § 1981. The district court granted Gates Rubber's motion for summary judgment as to all of Burnell's claims. Burnell then appealed the grant of summary judgment as to his Title VII discriminatory and retaliatory discharge claims and his § 1981 discrimination claim.

## II. ANALYSIS

We review a grant of summary judgment *de novo*, construing all facts and drawing all reasonable inferences in the nonmoving party's favor. *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256 (7th Cir. 2011). Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

*A. Discriminatory Discharge and § 1981 Discrimination*

Title VII discrimination claims and § 1981 discrimination claims are nearly identical, *see Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010), and Burnell treats them identically. Accordingly, we apply the same analysis to each. A plaintiff may show discriminatory discharge by the direct method or the indirect method. *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 733 (7th Cir. 2011). Burnell tries both, but he has not shown enough evidence to survive summary judgment under either approach.

*1. Direct Method*

To survive summary judgment under the direct method, Burnell needed to present either direct evidence of discriminatory intent (such as an admission) or enough circumstantial evidence to allow a rational jury to infer that discriminatory intent motivated his firing. *Id.* at 733-34. Circumstantial evidence may include suspicious timing; ambiguous statements; behavior or comments directed at others in the protected class; and evidence that similarly situated employees outside the protected class received systematically better treatment. *See Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009). Whatever circumstantial evidence a plaintiff presents "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

Burnell has presented only circumstantial evidence, and much of it concerns past racial discrimination and harassment—training, promotion testing, Payne, and so forth—that occurred mainly between 1993 and 1996. The pertinent evidence from the time of his discharge centers on Burnell's argument that Gates Rubber deviated from its normal disciplinary proceedings. But many of the "facts" Burnell cites for this argument have no basis in the record. For instance, Burnell claims that "[Gates Rubber] would terminate for not signing a commitment letter only if the underlying offense was a terminable offense, for which lying and insubordination did not qualify." In support of this claim, he cites Carvalho's February 11 deposition. But the testimony cited actually contradicts Burnell's claim: Carvalho clearly states that an employee might be fired for refusing to sign an insubordination warning.

Viewing the facts supported by the record in the light most favorable to Burnell, the strongest evidence pointing to discrimination is Totonchian's investigation of Burnell's apparent insubordination. Totonchian did not have others gather facts for him, as Burnell claims was the norm. Nor did he investigate the safety of turning down the relevant tools. Instead, he simply asked Gates about the situation. Gates's explanation contradicted Burnell's, and Totonchian believed Gates.[3]

---

[3] Though Burnell's brief suggests otherwise, Totonchian had no obligation to view the evidence in the light most favorable

(continued...)

At some point, Totonchian did ask Payne if Burnell should have known how to turn down the tools, and Payne said he should have. Burnell also points to Totonchian's "race card" statement as evidence that he acted with a discriminatory motive. Burnell does not explain how Totonchian's alleged accusation suggests a discriminatory motive, and we see no obvious connection. Regardless, the sum of Burnell's circumstantial evidence—including past discrimination, Totonchian's investigation, and the "race card" statement—would not allow a rational jury to conclude that racial discrimination caused Burnell's firing.

### 2. Indirect Method

To establish a prima facie case of discriminatory discharge under the indirect method of proof, Burnell needed to show that: (1) he is a member of a protected class; (2) his job performance met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated persons outside the class received more favorable treatment. *Montgomery*, 626 F.3d at 394. If Burnell establishes a prima facie case, Gates Rubber must give a legitimate reason for his discharge, at which point Burnell must produce evidence that the proffered reason for his firing is a pretext for racial discrimination. *Id.*

---

[3] (...continued)

to Burnell. The summary judgment standard applies to courts, not employers.

Everyone agreed that Burnell is a member of a pro-tected class and that he suffered an adverse employ-ment action. So Burnell needed only to provide evidence that his job performance met expectations and that simi-larly situated persons outside the class received better treatment. He has provided no such evidence. Instead, he points to testimony from Carvalho that an employee would not violate the code of conduct by refusing to perform an unsafe act. Burnell's argument—read gener-ously—assumes that everyone else at Gates Rubber would have been treated better had they been in Burnell's circumstances. This claim shows staggering self-pity on Burnell's part. More importantly, it does not show that any similarly situated person *actually* received better treatment than Burnell, as the fourth prong requires. Accordingly, Burnell cannot escape summary judgment on his discriminatory discharge claim via the indirect method of proof.

## B. Retaliatory Discharge

To demonstrate a prima facie case of retaliation by the direct method of proof, Burnell must provide evidence that he engaged in statutorily protected activ-ity, that he suffered a materially adverse employment action, and that the former caused the latter. *Silverman*, 637 F.3d at 740. Burnell's discharge was a materially adverse employment action. And before he was fired, Burnell complained regularly—almost habitually—about instances of real and perceived racial discrimination, including being sprayed with a hose; segregation in

training assignments; discrimination in application of the Operator A test; being passed over for a job; Payne's rumored desire not to work with black people; and lack of training from Payne. These complaints are protected activity under 42 U.S.C. § 2000e-3(a). *See Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 314-15 (7th Cir. 2011). To survive summary judgment, then, Burnell needed only to provide enough evidence to allow a jury to conclude Gates fired Burnell because of his statutorily protected complaints. *See Silverman*, 637 F.3d at 741.

The strongest evidence of causation is Burnell's deposition testimony that, during the December 19 interview, "[Totonchian] at one point said I guess I am playing the race card . . . I am the saddest employee he has ever seen. Just do the damn job. This is the last straw." Gates Rubber calls this part of Burnell's deposition testimony ambiguous. But at the summary judgment stage, we must resolve any ambiguity in Burnell's favor, and we do not think it a stretch to read Burnell's testimony as reporting that Totonchian had accused him of "playing the race card." By the end of the interview in which Totonchian allegedly made the "race card" comment, Totonchian had decided he wanted Burnell fired. Given Burnell's prior complaints of racial discrimination, Totonchian's statement is evidence that those complaints caused Burnell's discharge.

In response to Burnell's evidence of causation, Gates Rubber emphasizes that Burnell made no complaint of racial discrimination in the days leading up to his discharge on December 20, 2006. It is true that Burnell

denies bringing up race during his December 19 interview with Totonchian and Krause. But Burnell had complained to Totonchian about race discrimination in the past; he had complained to management about race discrimination as recently as early 2006; and Totonchian's "race card" comment suggests he may have believed Burnell's complaint about being written up was racially based. "[T]emporal proximity is only evidence of causation, not a separate element of the prima facie case, and thus there will be cases in which a plaintiff can demonstrate causation despite a substantial time lag." *Lalvani v. Cook County., Ill.*, 269 F.3d 785, 791 (7th Cir. 2001). Burnell certainly hasn't proven causation by a preponderance of the evidence, but his history of complaints and Totonchian's "race card" statement are enough to allow Burnell to survive summary judgment on his retaliation claim.

## III. CONCLUSION

Burnell has not pointed to any evidence that would allow a jury to conclude he was fired because of his race, but he has pointed to evidence that would allow a jury to conclude he was fired in retaliation for complaining about racial discrimination. Accordingly, we AFFIRM the district court's grant of summary judgment as to counts I and IV, but REVERSE the grant of summary judgment as to count III and REMAND for further proceedings.