In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 13-2893

JAMES NICHOLS,

*Plaintiff-Appellant,*

*v.*

MICHIGAN CITY PLANT PLANNING DEPARTMENT,
Michigan City Area Schools,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 12 CV 042 — **Philip P. Simon**, *Chief Judge.*

---

ARGUED DECEMBER 9, 2013 — DECIDED JUNE 19, 2014

---

Before WILLIAMS, SYKES, and HAMILTON, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* James Nichols sued his employer, the Michigan City Area Schools ("Michigan City"), alleging two Title VII violations. First, Nichols claimed that Michigan City required him to work in a hostile work environment at a school where he was a temporary janitor. However, he does not provide sufficient evidence that demonstrates that the harassment he allegedly suffered was severe or per-

vasive. Second, he claimed that Michigan City fired him because of his race. Once again, Nichols does not show sufficient evidence that his alleged harasser, Bette Johnston, was a proximate cause of his firing because affidavits from Nichols's supervisors show that he would have been let go even if there was no feud between him and Johnston. After discovery, Michigan City moved for summary judgment, which the district court granted. The record on appeal supports summary judgment in favor of Michigan City, and we affirm the district court's judgment.

## I. BACKGROUND

In January 2011, the Michigan City Area Schools ("Michigan City") hired James Nichols as a temporary, substitute janitor. Nichols first worked at Joy Elementary School without incident. Then he was sent to Springfield Elementary School as a replacement until a permanent janitor could be found for a recently retired janitor.

On his first day at Springfield Elementary, Nichols asked four employees where the janitor's closet was located. Unfortunately, none of them knew. After fifteen minutes of walking around, Nichols eventually found the closet. Later on, Nichols ran into the employees whom he had previously asked for help. When they saw that he found the room, they said to him, "Oh, you found it." Nichols believes that they said this in a mocking manner. Later that day, Nichols met Bette Johnston, the food service manager and his co-worker at Springfield Elementary. During their first meeting, Nichols claims that Johnston raised a towel, waived her hand as if she was scared of him, and mumbled something.

On Nichols's second day at Springfield, a purse was left unattended in an area Nichols was cleaning. It was never determined who owned the purse, but Nichols suspected it was a ruse designed to catch him in the act of stealing the purse. Nichols believes his co-workers tried to entrap him because he is African-American. Nichols alleges that on his third day, a teacher's aide pointed out his grandson and told Nichols not to speak with the child. The aide then, according to Nichols, stared at him during lunch. After lunch, Nichols cleaned the cafeteria floor and left to take out the trash, but when he came back, he found debris on the floor. He found this suspicious because no students were present when he left the room.

Nichols claims other incidents with racial undertones occurred as well. On one occasion, Nichols alleges that Johnston was walking with her assistant, and as they walked by, Johnston said to him, "You're a black n----r." When Nichols asked her what she said, Johnston responded that she was joking. On another occasion, Nichols alleges that Johnston was standing in the cafeteria with a group of school employees and while standing there he heard her say, "Where that boy at?" The group did not know that Nichols was within earshot, but he believes that the term was directed at him and was used in a racially derogatory manner.

On February 7, 2011, after an altercation between Johnston and Nichols, Principal Lisa Emshwiller asked Nichols's supervisors, Doug Schroeder and John Yeakey, to meet with her because she felt that Nichols was acting strangely. Emshwiller was the principal of Springfield Elementary, and Schroeder and Yeakey were maintenance foremen in the Plant Planning Department of the Michigan City Area

Schools who were responsible for the maintenance staff at Michigan City's schools and support buildings. Although all three worked for Michigan City in some capacity, there is no evidence in the record that Emshwiller was Nichols's supervisor or had any power to fire him.

After Emshwiller called Nichols's supervisors, Nichols asked to meet with her to report that he believed Johnston was harassing him. At that time, she told him that Johnston had filed a report complaining about his behavior. Johnston claimed that Nichols attempted to surreptitiously take photos of her. Nichols confirmed Johnston's account, but claimed that he did so to catch her in the act of mistreating him. Johnston also claimed that she bought him lunch, but that Nichols did not want it and shoved it back at her and said that he was praying for her. Nichols denied Johnston's allegations and claimed that Johnston marked the floors with pink highlighter (which turned out to be scuff marks from shoes), threw food on floors he had just cleaned, and bullied people. According to Nichols, it was during that meeting that he first informed Emshwiller that he had been called a racial epithet.

Following the meeting, Emshwiller met separately with both Schroeder and Yeakey to discuss what steps should be taken. It was at that time that Emshwiller told Schroeder and Yeakey that she and Johnston felt threatened by Nichols's accusations and strange behavior. Schroeder and Yeakey informed Emshwiller that they decided to remove Nichols from his assignment at Springfield Elementary. Shortly after the meeting, Schroeder and Yeakey ran into Nichols, at which point he told them about his issues with Johnston and how she allegedly tried to set him up. According to them,

Nichols appeared agitated, spoke very quickly, and sweated profusely. At that point, Yeakey told Nichols that the custodial position would be filled with a permanent employee the following week and that they would call him if they needed his services, but they never did.

In January of 2012, Nichols filed a pro se complaint against Michigan City asserting racial harassment and discrimination. Michigan City moved for summary judgment. Nichols timely filed his response, but attached unsworn and unverified statements in support of his motion. Michigan City filed a reply motion arguing that Nichols did not allege sufficient facts to support his harassment and discrimination claims. In addition, Michigan City filed a motion to strike the unsworn and unverified statements contained in Nichols's response. Despite the deficiencies in Nichols's memorandum, the district court considered his claims. In August 2013, the district court granted Michigan City's motion in its entirety, finding that the complained-of conduct did not give rise to Title VII liability, and Nichols now appeals.

## II. ANALYSIS

Nichols argues that the district court erred in granting summary judgment in favor of Michigan City. We review a district court's grant of summary judgment de novo and construe all facts and inferences in the light most favorable to Nichols as the non-movant. *Smiley v. Columbia Coll. Chi.*, 714 F.3d 998, 1001-02 (7th Cir. 2013). However, Nichols is not entitled to the benefit of "inferences that are supported by only speculation or conjecture." *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (citations and quotations omitted). "A factual dispute is 'genuine' only if a reasonable

jury could find for either party." *SMS Demag Aktiengesell-schaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009).

### A. Nichols Did Not Waive His Discrimination or Harassment Claims

As a preliminary issue, Michigan City argues that Nichols waived his harassment and discrimination claims because he advanced no cogent argument in the district court to explain why summary judgment was inappropriate. The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment. *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999). However, a trial court is obligated to give a liberal construction to a pro se plaintiff's filings. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Although Nichols did not outline the legal components of his argument in his response, nor provide sworn affidavits to support his position, with a liberal construction of his pleadings it is possible to see that he asserted both arguments. With regard to his hostile work environment claim, Nichols asserted that Johnston uttered a racial epithet, that his work environment was both subjectively and objectively offensive, and that the hostile conduct was pervasive. With regard to his discrimination claim, he essentially outlined a cat's paw theory of liability.

Under the cat's paw theory of liability, when a biased subordinate lacks decision-making power to fire an employee, but "uses [a] formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action," we will consider the biased subordinate's actions as direct evidence of discrimination. *Johnson v. Koppers, Inc.*, 726

F.3d 910, 914 (7th Cir. 2013) (citations and quotations omitted). In his response, Nichols stated that Johnston complained to Emshwiller, who then conveyed those complaints to Schroeder and Yeakey. Nichols then contended that Schroeder and Yeakey formed their opinion to fire him based on Johnston's input. Even though Nichols made this argument in the defamation section of his memorandum, it is clear to us that he made a cat's paw argument. Under the liberal pleading standard, these allegations are enough to preserve his claim.

## B. Nichols Did Not Provide Sufficient Evidence of a Hostile Work Environment

Nichols contends that Michigan City subjected him to race-based harassment by Springfield employees, who called him "boy," "black n----r," and treated him harshly. Title VII prohibits employers from discriminating against employees because of their race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). And employers are prohibited from "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To survive summary judgment on a racially hostile work environment claim, an employee must provide sufficient evidence that demonstrates: "(1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014).

Nichols's hostile work environment claim fails because he did not provide sufficient evidence for a reasonable juror to conclude that he was subjected to harassing conduct that

was severe or pervasive. It is important to note that the harassing conduct does not need to be *both* severe and pervasive. *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). One instance of conduct that is sufficiently severe may be enough. *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678 (7th Cir. 2001). Conversely, separate incidents that are not individually severe may trigger liability because they frequently occur. *Jackson*, 474 F.3d at 499. The key inquiry is whether the conduct was so severe or pervasive that it altered the conditions of the employment relationship. *Id.*

In determining whether the conduct is sufficiently severe or pervasive to be actionable, we look at the totality of the circumstances, including: (1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it was directed at the victim. *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 868 (7th Cir. 2013). "Courts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Hall v. City of Chicago*, 713 F.3d 325, 331 (7th Cir. 2013) (citation and quotation omitted).

Nichols claims that Johnston's alleged "black n----r" comment constitutes severe harassment. We have stated that while there is no "magic number of slurs" that indicates a hostile work environment, an "unambiguously racial epithet falls on the 'more severe' end of the spectrum." *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 950 (7th Cir. 2005) ("*Cerros II*") (citations and quotations omitted). However, while re-

ferring to colleagues with such disrespectful language is de-
plorable and has no place in the workforce, one utterance of
the n-word has not generally been held to be severe enough
to rise to the level of establishing liability. *Smith v. N.E. Ill.
Univ.*, 388 F.3d 559, 566 (7th Cir. 2004) (stating that "the mere
utterance of an … epithet which engenders offensive feelings
in an employee" does not necessarily violate Title VII even
though the plaintiff was referred to, but not in his presence,
as a "black motherf----er"). Nichols presents no evidence
that he was subjected to this type of offensive conduct more
than once. Since the one-time use of a racial epithet is not se-
vere enough to trigger liability, Nichols can only succeed if
the totality of the collection of allegedly harassing incidents
triggers liability. While it is a close call whether the conduct
here is severe or pervasive, Nichols's claim ultimately fails.

Nichols cites six incidents of harassment that he claims
occurred during the 2 ½ weeks that he worked at Springfield
Elementary: (1) Johnston (his co-worker) calling him "black
n----r"; (2) Johnston saying "where that boy at?" without
knowing that Nichols was within earshot; (3) Johnston
bringing Nichols food, but slamming the tray into his chest;
(4) Springfield employees not telling him where the janitor's
closet was located; (5) Springfield employees making a mess
for him to clean up; and (6) Springfield employees allegedly
baiting him to steal a purse and money from an open regis-
ter.

Experiencing six instances of harassment, if true, over the
course of 2 ½ weeks weighs in his favor, but the remaining
factors do not. First, Nichols does not allege that he was
physically threatened. Second, as far as we can tell, the al-
leged harassment did not interfere with Nichols's work per-

formance. Nichols claims that he performed his job well with no complaints.

Third, we do not find that a reasonable trier of fact could conclude that all of the allegedly harassing comments were directed at him. When harassing statements are "directed at someone other than the plaintiff, the impact of [such] 'second hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff." *Russell v. Bd. of Trs. of the Univ. of Ill. at Chi.*, 243 F.3d 336, 343 (7th Cir. 2001). Nichols alleges that Johnston said "Where that boy at?" while he was standing in the cafeteria. He assumes that the question was directed at him and must have been uttered in a racial manner because he is black. The Supreme Court has found that evidence of a manager referring to African-American employees as "boy" was probative of discriminatory animus. *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006). However, the Court said that the speaker's meaning will depend on context, inflection, and local custom. *Id*. Nichols did not provide evidence that shows that the comment was uttered in a discriminatory manner, and without knowing the context in which the comment was made, it is difficult to say that a reasonable juror could conclude that comment was uttered because of racial animus. *See Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 648 (7th Cir. 2011) (stating that a reasonable trier of fact could not conclude that the word "monkey" used over a jail intercom was used in a racially derogatory way based on the record that only indicated that the word was uttered, but gave no context surrounding the use of the word). Here, Nichols only points out that the statement was uttered, but he does not provide context that would help clarify the way in which the statement was used. It is not unreasonable, or even unthinkable, for an employee to say "Where that boy

at?" in an elementary school filled with boys. Without greater context, a reasonable juror could not conclude that "boy" was used in a racially derogatory manner or was directed at him.

Nor could a reasonable jury conclude, without additional evidence, that simply because someone left a purse behind that the purse was intended to ensnare Nichols. In his deposition, Nichols stated that he felt like someone left a purse out in the open in order to entrap him. However, he provides no evidence as to who may have left the purse or any evidence beyond speculation as to why a person might have left the purse. Nichols concedes that he did not know why someone left the purse nor did he have evidence that somehow linked the purse to a ploy designed to ensnare him on account of his race. It is not uncommon for people to inadvertently lose miscellaneous items, and without evidence beyond his conclusory statement that the purse was left to ensnare him in a trap, a reasonable trier of fact, without more, could not conclude that this alleged harassment was directed at Nichols.

Finally, Nichols has not presented sufficient evidence to support a finding that the six incidents he alleges occurred were of such an offensive nature to constitute actionable conduct. In *Cerros II*, we concluded that the harassment an employee faced was sufficiently offensive. The plaintiff provided evidence that he was subjected to direct and highly offensive racial epithets by coworkers and supervisors, where coworkers openly advocated for the Ku Klux Klan and "white power," and racially offensive graffiti was written on the bathroom walls such as "sp-cs," "wetb--ks," "go

back to Mexico," and "Tony Cerros is a sp-c." 398 F.3d at 951.

In *Lambert*, we also concluded that the harassment an employee faced was sufficiently offensive to defeat summary judgment. In that case, the plaintiff provided evidence that: a top manager, on at least five occasions over a four-year period, referred to yard laborers as "donkeys" in Lambert's presence and on one occasion called an African-American co-worker a "gorilla," and another supervisor told Lambert that he did not respect him because he is a "n----r" while yelling and screaming at him. 723 F.3d at 865. We stated that Lambert's case was right on the line of conduct that was offensive. *Id*. at 868.

In *Peters v. Renaissance Hotel Operating Co.*, in contrast, we affirmed summary judgment in favor of the employer. 307 F.3d 535 (7th Cir. 2002). In *Peters*, comments not directed at the plaintiff included a supervisor referring to "black music as 'wicka-wicka woo music,'" an employee's request to investigate an African-American guest who was allegedly stealing coins from a fountain, African-American guests being denied additional ice and cups at a party, and one incident where a co-worker used the word "n----r" in his presence. *Id*. at 552. Peters pointed to three additional comments that were directed towards or involved him: a supervisor asked a white co-worker to carry money when Peters and another African-American worker were present and available to do the job, the human resources director failed to say hello to Peters or another African-American worker, and "interracial strife" was revealed at a diversity training. *Id.* We stated that with the exception of the use of the word "n----r," which was not directed at Peters, the other acts were "mildly

offensive." *Id*. Our *Lambert* decision distinguished *Peters*, finding that Lambert's case was more serious than *Peters* because the supervisors in *Lambert* repeatedly called employees racially offensive terms, as opposed to the single unfortunate occurrence in *Peters*. *Lambert*, 723 F.3d at 869.

While the alleged actions Nichols faced were offensive, his case can be distinguished from the plaintiffs in *Cerros II* and *Lambert*. Cerros and Lambert were subjected to multiple racial epithets directed at them or uttered in their presence. Nichols can only point to one unambiguous incident that is of similar magnitude to that Cerros and Lambert faced. In addition, many of the other incidents that Nichols points to, such as Springfield employees not telling him where the janitor's closet was located, allegedly making a mess for him to clean up, and baiting him to steal a purse and money from a cash register are similar to the offensive behavior in *Peters* that we deemed not offensive enough to avoid summary judgment. While there is no place in today's workplace for the offensive behavior Nichols allegedly experienced, summary judgment on this claim was proper because Nichols failed to present sufficient evidence to support his hostile work environment claim.

### C. Nichols's Termination Did Not Violate Title VII

Nichols's claim that he was fired because of his race fares no better. An employer violates Title VII if it discharges or disciplines an employee because of that person's race, sex, or other protected grounds. *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). A plaintiff may use the direct or indirect method to prove discrimination. *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1104 (7th Cir. 2012). Nichols cannot prevail under either method.

Under the direct method, Nichols must provide either direct or circumstantial evidence of intentional racial discrimination. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 393 (7th Cir. 2010). Nichols may avoid summary judgment only by presenting sufficient evidence to create a triable issue as to whether his firing was motivated by discriminatory intent. *Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). On appeal, Nichols presents a cat's paw theory of liability and argues that Johnston, through Emshwiller, influenced Schroeder and Yeakey's decision to fire him. Under this theory, an employer is liable if a non-decision-maker who is motivated by discriminatory bias is a proximate cause of another employee's adverse employment action. *Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012). To prevail, Nichols must show that: (1) Johnston actually harbored discriminatory animus against him; and (2) Johnston's input was a proximate cause of Nichols getting fired. *Id.* "Proximate cause requires only some direct relation between injury asserted and injurious conduct alleged, and excludes only those links that are too remote, purely contingent, or indirect." *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1192 (2011) (citations and quotations omitted). Therefore, in order to survive summary judgment, Nichols needed to provide evidence to support a finding that Johnston's input was a proximate cause in his firing. *Id*. at 1193.

Once again, Nichols does not provide enough evidence for his claim to survive summary judgment. Affidavits by Emshwiller, Schroeder, and Yeakey assert that Nichols was fired because he acted strangely the day he was fired and there was concern about his mental state. Emshwiller stated that prior to when he was fired, Nichols was laid back and quiet, but on the day he was fired, he seemed to be "keyed

up." She further stated that she was concerned about Nichols's mental state because he was making odd accusations (such as that Johnston marked the floor with a pink highlighter) against Johnston and behaving strangely. Yeakey, Nichols's friend and the person who helped him get the job, confirmed that on the day Nichols was fired, Nichols was acting strangely and seemed different than previous times. Yeakey said that when he spoke to Nichols after his meeting with Emshwiller, Nichols appeared agitated, spoke quickly, and was sweating profusely. According to Schroeder's and Yeakey's affidavits, they removed Nichols from the school because Emshwiller and Johnston felt threatened by his continued presence.

It is true that both Schroeder and Yeakey considered the issues Johnston raised about Nichols when they fired him. (Doc. 30-4, ¶ 6; Doc. 30-5, ¶ 4). But in their affidavits, they stated that regardless of what happened between Johnston and Nichols, Nichols's position was going to be filled with a permanent employee the next week. (Doc. 30-4, ¶ 9; Doc. 30-5, ¶ 7). Their statements show that the dust up between Nichols and Johnston, and her subsequent complaints, had nothing to do with Nichols getting fired because his position was going to be filled by a permanent employee the next week even if he was a model employee. These statements are sufficient to break the nexus between Johnston's input and Nichols's firing, and Nichols presents no evidence to contradict either Schroeder's or Yeakey's account. Although Schroeder and Yeakey considered Johnston's input, their ultimate decision was based on their belief that Nichols was acting strangely, and that a permanent employee would be found to replace Nichols. Therefore, Johnston's input was not a proximate cause of Nichols's firing.

Since Nichols cannot prevail under the direct method, we will now examine his claim under the indirect method's burden-shifting framework. Under the indirect method, Nichols must introduce evidence that he: (1) is a member of a protected class; (2) performed his job satisfactorily; (3) suffered an adverse employment action; and (4) was treated less favorably than a similarly situated employee outside of Nichols's protected class. *Burnell v. Gates Rubber Co.*, 647 F.3d 704, 709 (7th Cir. 2011) (citations omitted). If Nichols establishes a prima facie case, the burden shifts to Michigan City to provide a legitimate reason why Nichols was fired. *Id.* If Michigan City gives a legitimate reason, then Nichols must produce evidence that Michigan's City's proffered reason for firing Nichols is a pretext for racial discrimination. *Id.* Michigan City stipulates that Nichols, an African-American, is a member of a protected class, and that he suffered an adverse employment action.

Nichols's claim fails because he cannot show that similarly situated employees that are not African-Americans received more favorable treatment. We have said that even if a plaintiff cannot identify similarly situated employees he can still make a prima facie case of discrimination. *Timmons v. General Motors Corp.*, 469 F.3d 1122, 1126 (7th Cir. 2006). To meet his burden under the fourth prong, a plaintiff must show "that the circumstances surrounding the adverse action indicate that it is more likely than not that his [race] was the reason for it." *Id.* (citation and quotation omitted).

Nichols's only evidence is the timing of his firing; i.e., Johnston allegedly held racial animus towards him, she met with his supervisors, and shortly thereafter he was fired. While suspicious timing may raise a genuine issue of fact

about discrimination, "suspicious timing alone is rarely enough to survive summary judgment." *Morgan v. SVT, LLC*, 724 F.3d 990, 998 (7th Cir. 2013). We do not find suspicious timing here. In addition, as we explained above, the timing of Nichols being fired was governed by what three employees called his "strange" behavior and that the job was being filled by another person. Because Nichols did not meet his legal burden, summary judgment was appropriate.

### III. CONCLUSION

The judgment of the district court is AFFIRMED.