In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-3766

JOHN MICHAEL WOODS,

*Plaintiff-Appellant,*

*v.*

CITY OF BERWYN,[*]

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12-cv-1900 — **Matthew F. Kennelly**, *Judge.*

ARGUED SEPTEMBER 30, 2014 — DECIDED OCTOBER 15, 2015

Before KANNE, WILLIAMS, and HAMILTON, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* When John Woods told a co-worker at the Berwyn Fire Department that "he wanted to

---

[*] Although the caption originally reflected Ronald Hamilton as an appellee, we have removed him since the only counts in the complaint relating to Hamilton were not part of this appeal.

kill somebody, all of them" and that his children were going to "go over there" and "tune them up," referring to his coworkers and superiors, Fire Department Chief Denis O'Halloran looked into the statements and eventually recommended termination. A three-member panel for the Board of Fire and Police Commissioners conducted a hearing on O'Halloran's recommendation. Woods was represented by counsel, who gave opening and closing statements, put on witnesses, cross-examined others, made and won objections, and presented exhibits. After the hearing, the Board voted to terminate Woods based largely on the testimony of the co-worker to whom Woods made the statement. Woods filed a complaint in federal court asserting discrimination and unlawful retaliation and attempted to proceed under a cat's paw theory of liability, which applies in employment discrimination cases when a biased subordinate who lacks decision-making power uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action. Under Woods's theory, O'Halloran was the discriminatory subordinate who used the formal decision-maker (the Board) to fire him. However, based on the full and independent evidentiary hearing and the Board's almost complete reliance on the co-worker's testimony, any discriminatory animus by O'Halloran cannot be the basis for the cat's paw liability. Without that, Woods cannot make out a prima facie case, and we affirm the grant of summary judgment.

## I. BACKGROUND

Because we are reviewing a grant of summary judgment, we present the facts and draw all reasonable inferences in the light most favorable to Woods, the non-moving party.

*Nichols v. Mich. City Plant Planning Dept.*, 755 F.3d 594, 599 (7th Cir. 2014). Although our decision does not ultimately turn on the events that Woods alleges were discriminatory, we present them to give context to Woods's case.

In January 2010, Berwyn Fire Department Lieutenant John Woods sustained a back injury from carrying a 350-pound heart attack victim. Woods was cleared to return to work in April, but did not return until June because of persistent pain. Before Woods's return, Chief O'Halloran and Assistant Chief Frank Simek sent him two memoranda with instructions to complete the enclosed Family Medical Leave Act paperwork. Simek also visited Woods's home and reiterated that the FMLA paperwork needed to be signed because it revolved "around [his] status as a fireman." Fearing for his job's safety, Woods signed the FMLA paperwork.

Upon Woods's return, O'Halloran informed Woods that he had three options: he could go on normal retirement, on duty-related disability, or on a nonduty-related disability. Woods said he was not interested in any of the options and, instead, successfully bid on a position as the Fire Department's Training Officer. Woods later learned from his friend, Joe Lotito, that Chief O'Halloran had asked Lotito to put his own name on the bid list so that O'Halloran would not have to choose Woods. Woods nonetheless began work, but reported that the training he received was inadequate. Specifically, he asserted that he did not get assistance in planning, that prior lesson plans had been removed just before he started, and that he was constantly criticized for his work.

One year later, in May 2011, Woods was participating in an arduous fire burn training exercise on a hot day and told O'Halloran he was "stoking the fire" to which O'Halloran

responded "Yeah, it's a young man's job, Mike." Later that same month, Woods met with Assistant Chief Dick Swade and Deputy Chief Greg DiMenna who told Woods that they wanted him to retire or that he would be fired. In a separate conversation, Woods relayed to Deputy Chief Sam Molinaro that Woods wanted to remain at his job, but wanted the harassment to stop.

In a meeting later that month with Chief O'Halloran, Woods said he wanted to leave the Training Officer's position because he was being harassed and not given a fair opportunity to succeed. O'Halloran posted a bid sheet to find a replacement. If no one signed up, the position would automatically go to the lieutenant with the lowest seniority, Ronald Hamilton, a friend of Woods's, who did not want the job.

Woods and Hamilton had a conversation one week later on June 3. Although Woods claims the conversation focused on Hamilton's displeasure with the possibility of being assigned as a Training Officer, Hamilton's contemporaneous notes say:

> Sometime during our conversation [Woods] stated to me that at one time he wanted to kill somebody, all of them. He stated that his kids asked him for the addresses, and that they would go "over there" and "tune them up." Mike also stated that with all the stress he is under that he was thinking of going back to the psychiatrist. He also said something on the lines of hurting himself.

Woods denies threatening harm to himself or anybody else. According to Woods, Hamilton began screaming at Woods, saying that Woods messed up his own life and now was messing up Hamilton's life.

Hamilton's version of the conversation was relayed to, among others, O'Halloran, who asked that the Berwyn police conduct a well-being check on Woods. Four officers went to visit Woods, who denied making any threats, and reported that Woods was calm, polite, and in good spirits. They concluded Woods was not a threat to himself or others and left.

O'Halloran ordered Woods to undergo a psychological evaluation conducted by O'Halloran's own selected psychologist, Dr. Anthony DeJoseph, to determine whether Woods was homicidal or suicidal. The psychologist reported there was no way of making a definitive determination whether Woods made the statements to Hamilton, but that Woods was honest and forthcoming and was not at risk of harming himself or others. O'Halloran disregarded Dr. DeJoseph's report and conducted his own investigation, including an interrogation of Woods where Woods again denied making any threats.

On July 21, 2011, O'Halloran issued a Statement of Charges against Woods and requested that the Berwyn Board of Fire and Police Commissioners terminate Woods's employment. The Statement of Charges relayed the conversation between Woods and Hamilton in the factual section, and included charges for conduct unbecoming an officer, fighting/verbal abuse, violation of Illinois's disorderly conduct law (720 Ill. Comp. Stat. § 5/26-1(a)(1)), and false statements made during O'Halloran's investigation.

At the hearing on the Statement of Charges, the Board heard testimony, opening and closing statements, viewed exhibits and ruled on objections. Woods was represented by counsel. One week later, the Board issued a one-page ruling—without reference to any facts or law—that Berwyn had met its burden of establishing by a preponderance of evidence that Woods was guilty of the charges against him and there was cause for discharge. After twenty-three years with the Department and at fifty-three years old, Woods was terminated. He challenged the administrative ruling in state court and, upon a remand for a more detailed opinion, the Board issued an eight-page opinion. That opinion has since been upheld as not arbitrary, capricious or unreasonable by two courts. *See Woods v. City of Berwyn*, 11-ch-32916 (Cook Cnty. Cir. Ct. Oct. 4, 2013); *Woods v. City of Berwyn*, 13-3450 (Ill. App. Ct. Oct. 29, 2014).

Meanwhile, Woods filed the complaint relevant to this appeal in which he alleged, among other things, the four counts on appeal: (1) retaliation under the Family Medical Leave Act; (2) discrimination under the Americans with Disabilities Act; (3) discrimination under the Age Discrimination in Employment Act; and (4) retaliation under Illinois's Workers' Compensation Act. The district court granted summary judgment on all counts in favor of the City of Berwyn. Woods appeals.

## II. ANALYSIS

Woods argues he has presented sufficient evidence to raise a genuine issue of material fact as to whether O'Halloran's discriminatory animus could be imputed to the Board, thereby supporting a cat's paw theory of liability. He also argues that he presented a genuine issue of material fact

as to whether the Department's and O'Halloran's decisions to fire him were pretextual.

As noted, we construe all facts and reasonable inferences in the light most favorable to Woods, the non-movant. *Nichols,* 755 F.3d at 599. Summary judgment should be granted if there is a genuine issue of material fact. *Id.* However, we need not draw inferences that are supported by "only speculation and conjecture." *Id.* (internal quotation omitted). A factual dispute is only "genuine" "if a reasonable jury could find for either party." *Id.* (internal quotation omitted).

Woods admits that he cannot show that the direct decision-maker, the Board, acted with discriminatory animus. Instead, he relies on the "cat's paw" theory of liability. We were the first circuit to use the phrase "cat's paw" when discussing a subordinate using her superior to commit a discriminatory act in the employment discrimination context. *See Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990). As the Supreme Court noted, the phrase comes from one of Aesop's Fables in which a monkey induces a cat, by flattery, to extract roasting chestnuts from the fire. *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1 (2011). The duped cat burns its paws while getting the chestnuts, and the monkey takes them, leaving the cat with nothing. *Id.* In the employment discrimination context, the cat's paw theory of liability applies when "a biased subordinate who lacks decision-making power uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Matthews v. Waukesha Cnty.*, 759 F.3d 821, 828 (7th Cir. 2014) (internal citations omitted); *see also Staub*, 562 U.S. at 419 (applying cat's paw theory to Uniformed Services Employment and Reemployment Rights Act).

In *Staub*, an appeal from one of our decisions, the Supreme Court adopted the cat's paw theory of liability and held that it is based on tort-law concepts of proximate causation. 562 U.S. at 420. In that case, the alleged biased subordinate submitted a disciplinary warning for Staub's purported violation of a company rule, which Staub alleged was false and motivated by discriminatory animus. *Id.* at 413–15. Two other co-workers stated that Staub was unreliable and, based on that information and a review of Staub's personnel file, a supervisor fired him. *Id.* While we found there was no liability since the subordinate was not the "singular influence" in the firing, the Supreme Court reversed our decision. *Id.* at 415–16, 422–23. The decision in *Staub* changed the law in this circuit. Here, we do not attempt to outline a universal framework for post-*Staub* cases. The application of *Staub* principles in this case is limited to these facts.

The Court stated that under a cat's paw theory there must be "some direct relation between the injury asserted and the injurious conduct alleged" that is neither "too remote, purely contingent, or indirect." *Id.* at 419 . The ultimate decision-maker's exercise of judgment alone does not render the subordinate's discriminatory animus "remote" or "purely contingent," but instead creates an additional proximate cause. *Id.* In other words, just because someone else has to make the ultimate termination decision does not remove the subordinate's discriminatory animus as a proximate cause.

However, the Court noted there are acts that can change the subordinate's discriminatory animus from a proximate cause to a cause that is too remote to support cat's paw liability. As the Court said, even if there is an independent inves-

tigation, "the supervisor's biased report may remain a causal factor if the independent investigation takes it into account *without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified.*" *Id.* at 421 (emphasis added). If the ultimate decision-maker does determine whether the adverse action is entirely justified apart from the supervisor's recommendation, then the subordinate's purported bias might not subject the employer to liability. This is consistent with our previous holdings that "the chain of causation can be broken if the unbiased decision-maker conducts a meaningful and independent investigation of the information being supplied by the biased employee." *Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 383 (7th Cir. 2011). To hold otherwise would be to rule that whenever a discriminatory subordinate makes an allegation or institutes a charge and the plaintiff-employee is fired, there are no steps the ultimate decision-maker could ever take to break that chain of proximate causation. That cannot be so. *Cf. Polland v. Chertoff*, 494 F.3d 1174, 1181 (9th Cir. 2007) (rejecting argument that "any time a biased employee … sets in motion the process that leads to an adverse employment action, the employer would be liable, even if the employer then conducted an entirely independent inquiry and decision-making process insulated from the animus of the biased employee").

Woods takes the position that because O'Halloran recommended his termination and issued the Statement of Charges, the Board's full-scale hearing into those Charges still does not insulate the Department's decision because the Charges set the wheels in motion for his termination. However, Woods's position is contrary to the Court's statement that a determination apart from the biased subordinate's

recommendation can break the chain of causation. *Staub*, 562 U.S. at 420–21. Here, the Board's formal and adversarial procedures and the evidence that the Board relied on to support its decision to terminate Woods broke the chain of causation.

The Board conducted a full trial with attorneys, opening statement and closing arguments, direct and cross-examination of witnesses, including Woods, objections and the introduction of evidence. The hearing included decisions made by the Board that went Woods's way and others that did not. Indeed, the Board did not just take the Statement of Charges at face value, thereby delegating its fact-finding to the potentially biased O'Halloran. Rather, the Board conducted its own fact-finding proceeding. These facts weigh in favor of finding that the Board's hearing broke the causal chain. *See Lacks v. Ferguson Reorganized Sch. Dist. R-2*, 147 F.3d 718, 725 (8th Cir. 1998) (finding that the school board's hearing consisting of testimony from the plaintiff and fifteen other witnesses and a review of other documentary and video evidence was an independent investigation sufficient to break causation). Nonetheless, this hearing procedure does not automatically negate the influence of the potentially biased O'Halloran. *See Staub*, 562 U.S. at 420–21.

We note that because the unbiased decision-maker could possibly rely on facts provided by the biased supervisor, a formal adversarial procedure does not automatically break the chain of causation. *See Staub*, 562 U.S. at 420–21. But, if the employer's procedure "results in an adverse actions for reasons unrelated to the supervisor's original biased action …, then the employer will not be liable. *Id.* at 42. In this case, the hearing broke the chain of causation because the record shows that the Board did not rely on the facts presented by

the presumably biased O'Halloran. Instead, the Board relied on testimony from Hamilton, who did not harbor any discriminatory animus. The Board found in its eight-page opinion "Lt. Hamilton's testimony about his conversation with Lt. Woods on June 3, 2011" was credible based on Hamilton's "demeanor while testifying" and that Hamilton "had no motive or basis for lying and that his actions immediately following his conversation with Lt. Woods were consistent with his testimony." All of the citations for the Board's findings regarding the conversation are to Hamilton's testimony, and it found that the threats were cause for termination. O'Halloran did not even testify as to the contents of the conversation, nor could he since he was not present during the conversation. In other words, the Board made its determination without relying on any of O'Halloran's statements or actions. This shows the Board was not an unwitting dupe and did not rely on O'Halloran to reach its decision.

O'Halloran might have instituted the action, but once the Board began its hearing, it determined that the "adverse employment action was, apart from the supervisor's recommendation, entirely justified." *Staub*, 562 U.S. at 421. Had the Board relied on O'Halloran's statements or failed to independently determine whether the conversation with Hamilton happened, this might be a different case. But that is not what happened here since the Board did conduct an independent hearing and therefore broke the chain of causation. *See, e.g., Staub*, 562 U.S. at 421("[I]f the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action … then the employer will not be liable.") *Lobato v. N.M. Env't Dept.*, 733 F.3d 1283, 1294 (10th Cir. 2013) ("[I]f the employer independently verifies the facts and does not rely on the biased source—then there

is no subordinate bias liability" (internal citation omitted));
*Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 836-37
(6th Cir. 2012) (finding no liability where office conducted
independent investigation including seven witness inter-
views and found a violation of four work rules—only one
relying on the biased party's report—each of which would
have supported termination); *cf. McKenna v. City of Philadel-
phia*, 649 F.3d 171, 178-79 (3d Cir. 2011) (affirming jury ver-
dict in favor of employee when record of disciplinary hear-
ing failed to show employee could call witnesses on his be-
half or cross-examine biased supervisor, and also failed to
show the content of the testimony of the other witnesses
aside from biased party).

Woods further argues the Board was not independent
and, in fact, did O'Halloran's bidding and so any appearance
of impartiality was phony. He points to statements by
O'Halloran that only O'Halloran could fire him, that
O'Halloran ran the Department rather than the Board, and
the fact that O'Halloran was "not aware of" and could not
"recall any" occurrences when the Board rejected any pro-
posed discipline in the past ten years. However, Woods's
theory is not sufficient to raise a genuine issue of fact that
the Board just rubber-stamped O'Halloran's recommenda-
tion in this case. First, it is clear from its practice that the
Board did have the ultimate firing power; otherwise the
hearing would not have been necessary. Second,
O'Halloran's statement about the Board's previous adoption
of management's recommendations related to all members of
management, not just his own, and represented under five
recommendations over ten years. We decline to infer that,
based on that few recommendations over that period, the
Board rubber-stamps all of O'Halloran's recommendations.

We would be more inclined to accept this theory if there was any evidence that the Board did not conduct full hearings in those cases, that those decisions were without merit, or that they relied entirely on the Statement of Charges without any other support. *Cf. Schandelmeier-Bartels*, 634 F.3d at 381 (finding that a jury could conclude that the employer's investigation was irrelevant because biased employee was the sole source of nearly all pertinent information relied upon in the decision to terminate the plaintiff). Without more, we cannot infer that the Board rubber-stamps every recommendation made by management. But most importantly, for the reasons discussed, Woods has failed to present a genuine issue of material fact that the Board was rubber-stamping O'Halloran's recommendation *in this case*.

Our conclusion is further supported by the absence of a similarly situated individual. To be a sufficiently similar comparator, the individual ordinarily should have dealt with the same supervisor, been subject to the same standards, and engaged in similar conduct of comparable seriousness. *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012). Woods failed to propose the name of any firefighters who engaged in conduct that involved serious threats or violence like Woods, who were brought before the Board, and were not terminated by the board upon hearing evidence of such conduct.

Finally, Woods argues that with all reasonable inferences and the evidence looked at in the light most favorable to him, he did not make the statements Hamilton attributes to him. Though that could be true, we do not need to determine whether or not Woods made those statements to find that the independent hearing broke the chain of causation

between O'Halloran and the termination decision. It is sufficient under the cat's paw theory that the Board found Woods made those statements and that the Board was not subject to O'Halloran's control. Because Woods cannot prevail under his cat's paw theory, and he advocates no other theory of liability, his claims must fail.[1]

### III. CONCLUSION

For these reasons, we AFFIRM the judgment of the district court.

---

[1] Because Woods failed to establish a prima facie case of liability, we do not need to address his arguments on the issue of pretext. *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012).