NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports.  Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us.  Opinions are available on the Internet by 9:00 a.m. on the morning of their release.  The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Strafford
No. 2018-0624


AMY M. BURNAP

v.

SOMERSWORTH SCHOOL DISTRICT

Argued: September 18, 2019
Opinion Issued: October 25, 2019


Haughey, Philpot & Laurent, P.A., of Laconia (Samantha M. Jewett on the brief and orally), for the plaintiff.


CullenCollimore, PLLC, of Nashua (Brian J. S. Cullen on the brief and orally), for the defendant.


DONOVAN, J.  The plaintiff, Amy M. Burnap, appeals an order of the Superior Court (Howard, J.) granting summary judgment to the Somersworth School District (District) on her claim of employment discrimination based upon her sexual orientation.  She argues that the trial court erred because there are disputed material facts that could allow a jury to determine that the District's stated reason for firing her — sexual harassment — was a pretext for unlawful sexual orientation discrimination because: (1) her colleagues' alleged discriminatory animus infected the District's decision to fire her; and (2) a preliminary investigation conducted prior to the District's decision was a

"sham." We affirm because there are insufficient facts in the record from which a jury could find, under either argument, that the District fired the plaintiff because of her sexual orientation and used sexual harassment as a pretext.

I. Facts

The following facts are drawn from the evidence presented to the trial court. The District hired the plaintiff as the Dean of Students at Somersworth High School for a one-year period beginning in July 2015. It is undisputed that the plaintiff "is a member of a protected class of Lesbian, Gay, Bisexual, and Transgender individuals." In January 2016, several instances of purported misconduct involving the plaintiff came to light, setting in motion a sequence of events that culminated in her termination.

On January 15, 2016, a school secretary reported to her supervisor, another dean at the school, that the secretary gestured to the plaintiff with her middle finger, commonly referred to as "flipping someone off." The plaintiff reportedly responded to this gesture by saying "I'm going to say something inappropriate. I probably shouldn't, but I will anyway. I prefer two or three." The secretary interpreted this comment as having a sexual connotation.

Later that day, two other staff members reported to the dean two other incidents involving the plaintiff. In one incident, the plaintiff reportedly stated "that's so hot" when she observed two female staff members hug. In the other incident, the plaintiff reportedly commented "I don't do straight" in response to a student calling her attention to a wall decoration that was hanging off-kilter.

On January 19, 2016, the dean reported these allegations to the District superintendent, who decided to inform the school principal when the principal returned to the school later that week. On January 22, 2016, another staff member reported to the dean that, on the preceding day, the plaintiff made a sexual comment when a school resource officer, during a discussion about handcuff use on students, placed handcuffs on a staff member to see if she could slip out of them. The dean reported this allegation to the principal, and together they presented the superintendent a written summary of the four incidents described above.

Later that day, the superintendent informed the plaintiff that she was being placed on leave until the allegations had been investigated. The superintendent assigned the school principal and the Title IX coordinator to investigate. They interviewed at least nine staff members, and interviewed the plaintiff twice. Their interviews confirmed the allegations and unearthed other instances of purported misconduct. During one such instance, the school secretary described how, when she was dressed in a Batman costume as part of a theme day, the plaintiff looked her up and down and made a sound of approval, which the secretary interpreted as having a sexual connotation.

Another staff member reported that on another occasion the plaintiff stated, "it turns me on" when the plaintiff sat in a certain chair, and on yet another occasion the plaintiff commented that the staff member was "smart for a blonde."

During her first interview, the plaintiff acknowledged making the statements "I prefer two or three" and "I don't do straight," but denied making a sexual comment during the handcuff incident, and stated that she did not remember the other incidents. During their second interview with the plaintiff, the investigators believed that the plaintiff intended to intimidate them when she kicked a door stop to close the door to the interview room, and as a result included in their report an allegation of retaliation and intimidation against the plaintiff.[1]

The investigators prepared a twelve-page report that described and found credible the allegations of misconduct and retaliation, and recommended that the plaintiff be terminated for violating the District's sexual harassment and ethics policies. On January 29, 2016, the report was submitted to the superintendent, who agreed with its conclusions and recommendation. The superintendent then submitted a recommendation that the plaintiff be terminated to the District School Board for a final decision.

In March 2016, the Board held a hearing over the course of three nights, during which it heard sworn testimony from thirteen witnesses, closing arguments from both parties, and considered exhibits submitted by the parties. Prior to the hearing, the school investigators' report was disseminated to the District's witnesses. The witnesses' testimony recapitulated the instances of alleged misconduct described above. The plaintiff testified and was represented by counsel, who cross-examined the witnesses at length. The Board concluded, in a ten-page decision, that six of the alleged incidents of misconduct were substantiated and violated both the District's sexual harassment and ethics policies. It also found that one allegation, the "I don't do straight" comment, did not violate either of those policies, and that the allegation of retaliation by the plaintiff was unfounded. The Board decided that the plaintiff's actions merited termination.

The plaintiff then brought a breach of contract claim against the District in the superior court, and concurrently pursued a discrimination claim with the New Hampshire Commission for Human Rights and the United States Equal Employment Opportunity Commission. After receiving a notice of the right to sue, the plaintiff filed a discrimination claim and various tort claims in the superior court, which were consolidated with her breach of contract claim. The District then moved for summary judgment on the discrimination and tort

---

[1] The District's sexual harassment policy includes a provision barring retaliation against individuals who participate in a sexual harassment investigation.

claims.  In support of its motion, the District submitted affidavits from the nine Board members involved in the determination to terminate the plaintiff, averring that they did not consider the plaintiff's sexual orientation in reaching their decision.  In support of her motion opposing summary judgment, the plaintiff submitted an affidavit denying that she did or said any of the acts which the school investigators found constituted sexual harassment.

The trial court concluded that "the evidence does not support a finding that [the District] or its employees were motivated by a discriminatory animus," noting that there was no evidence that the Board members considered the plaintiff's sexual orientation in reaching their decision.  Accordingly, the trial court granted the District's motion.[2]  The plaintiff appeals that order, but only with respect to the discrimination claim.

## II. Standard of Review

We review the trial court's grant of summary judgment de novo.  Clark v. N.H. Dep't of Emp't Sec., 171 N.H. 639, 650 (2019).  Summary judgment is appropriate when the evidence is devoid of genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Id.  We consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the non-moving party.  Id.  Nonetheless, the party opposing summary judgment must do more than merely deny the facts in the moving party's affidavits.  Omiya v. Castor, 130 N.H. 234, 237 (1987).  Rather, she must set forth "specific facts showing the existence of a genuine issue for trial."  Lake v. Sullivan, 145 N.H. 713, 715 (2001) (quotation omitted).

In employment discrimination cases, courts must exercise caution when evaluating "elusive concepts such as motive or intent" or whether an employer's stated reason for an employment decision is a pretext.  Hodgens v. General Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998).  However, summary judgment is appropriate if the plaintiff "rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."  Ameen v. Amphenol Printed Circuits, Inc., 777 F.3d 63, 68 (1st Cir. 2015) (quotation omitted).

## III. Analysis

The New Hampshire Law Against Discrimination prohibits an employer from discriminating against an individual on the basis of sexual orientation.  RSA 354-A:7, I (Supp. 2018).  In interpreting RSA chapter 354-A, we are aided by the experience of the federal courts in construing the similar provisions of

---

[2] Following the trial court's ruling on partial summary judgment, the plaintiff voluntarily non-suited her breach of contract claim.

Title VII of the 1964 Civil Rights Act.  See Scarborough v. Arnold, 117 N.H. 803, 807 (1977).

Federal courts have described two ways a plaintiff can survive summary judgment in employment discrimination cases.  See Nichols v. Southern Illinois Univer.-Edwardsville, 510 F.3d 772, 779 (7th Cir. 2007); Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004).  First, a plaintiff can demonstrate "direct evidence" of discrimination.  Griffith, 387 F.3d at 736.  Direct evidence — which does not, in this context, mean the converse of circumstantial evidence — suggests a strong causal link between the alleged discriminatory animus and the challenged employment decision "sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action."  Id. (quotation omitted).

Second, if a plaintiff's evidence of the link between the discriminatory animus and employment decision is indirect, in that it does not "clearly point[] to the presence of an illegal motive," the plaintiff must resort to the burden-shifting paradigm articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  Griffith, 387 F.3d at 736; see Burns v. Town of Gorham, 122 N.H. 401, 406-07 (1982) (applying the McDonnell Douglas burden-shifting framework in evaluating a claim brought under RSA chapter 354-A).  Under the McDonnell Douglas framework, the plaintiff must first establish a prima facie case of discrimination.  Burns, 122 N.H. at 406.  Then, the defendant is required to put forth some legitimate, nondiscriminatory basis for its action.[3] Id. at 408; Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).  Once the defendant makes this showing, the burden shifts back to the plaintiff to offer sufficient evidence of a genuine issue of material fact that the proffered reason is a pretext for unlawful discrimination.  See Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 9 (1st Cir. 1990).  Of course, the plaintiff must do more than dispute the employer's stated justification; she must "elucidate specific facts which would enable a jury to find that the reason given was not only a sham, but a sham intended to cover up the employer's real motive": here, sexual orientation discrimination.  Id.

Lacking any evidence to suggest a strong link between discriminatory animus and her termination, the plaintiff must rely on the McDonnell Douglas burden-shifting framework for her claims to survive summary judgment, and we now turn to the application of that framework.  Like the trial court, we assume, without deciding, that the plaintiff has made the threshold showing of a prima facie case of sexual orientation discrimination.  The District has, in turn, met its burden of putting forth a legitimate, nondiscriminatory basis for its decision by asserting, and providing evidence to support its assertion, that

---

[3] This requirement is merely a burden of production; the burden of proving discrimination rests at all times with the plaintiff.  Mesnick v. General Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991); see Burns, 122 N.H. at 408.

5

it terminated the plaintiff based upon several instances of sexual harassment. The plaintiff, however, has failed to identify sufficient evidence in the record from which a jury could conclude that sexual harassment was a pretext for sexual orientation discrimination.

As an initial matter, there is no evidence that the Board itself harbored any discriminatory animus, or that it did not believe that several of the misconduct allegations described in the testimony before it rose to the level of sexual harassment as described in the District's policy. See Mulero-Rodríguez v. Ponte, Inc., 98 F.3d 670, 674 (1st Cir. 1996) (noting that in weighing whether there is sufficient evidence for a jury to find pretext, the issue is whether the decision-maker believed the stated justification to be authentic). The policy defines sexual harassment, in part, as "conduct of a sexual nature when . . . [t]he unwelcome conduct has the purpose or effect of unreasonably interfering with a person's work performance or creating an intimidating, hostile, or offensive working environment." Termination is a possible consequence of violating this policy.

The Board found that on six occasions the plaintiff violated this policy by engaging in unwelcome conduct, inappropriate behavior, and communications of a sexual nature. Nothing in the record suggests that the Board's sexual harassment finding was not genuine and thus pretextual.[4] Cf. Burns, 122 N.H. at 408 (upholding the trial court's finding that an employer's nondiscriminatory rationale — that it did not hire a female because she lacked a high school diploma — was pretextual based upon evidence that it later hired a male who did not have a high school diploma). The plaintiff has also failed to identify any evidence suggesting that the Board harbored a discriminatory animus towards her based upon her sexual orientation. To the contrary, every Board member averred that he or she did not consider the plaintiff's sexual orientation in reaching a decision, and the plaintiff has not offered contradictory evidence. There is thus insufficient evidence from which a jury could conclude that the Board itself used sexual harassment as a pretext for sexual orientation discrimination. See Omiya, 130 N.H. at 237 (explaining that the party opposing summary judgment must do more than merely deny the facts set forth in the moving party's affidavit).

Without evidence that the Board was motivated by a discriminatory animus, the plaintiff primarily argues that school staff members harbored a discriminatory animus towards her. She attempts to connect their perceived

---

[4] The Board concluded that each instance of misconduct which violated the District's sexual harassment policy also violated the District's ethics policy. The ethics policy contains a non-exhaustive list of standards, which require that employees, among other things, "[m]aintain just, courteous, and proper relationships with . . . staff" and "[e]xhibit professional conduct both on and off duty." Termination is also a possible consequence for failing to follow the ethics policy. The plaintiff fails to argue or explain how a jury could conclude that this justification was also a pretext.

6

animus to the Board's decision, first, through the "cat's paw" theory of imputing discriminatory intent to the final decision-maker and, second, by arguing that the school-level investigation was a "sham." We discuss each argument in turn.

## A. The "Cat's Paw" Argument

The plaintiff argues that a jury could find that a discriminatory animus tainted the District's decision through the "cat's paw" theory.[5] This theory applies when the final employment decision-maker, who possesses no discriminatory animus, is influenced by a co-worker or supervisor of the plaintiff who maintains a discriminatory animus. See Staub v. Proctor Hospital, 562 U.S. 411, 417, 419 (2011). We have never considered, and need not decide here, whether a plaintiff could survive summary judgment on a discrimination claim brought under RSA chapter 354-A relying on the cat's paw theory because, even if the theory applies to this case, the plaintiff's claims are unavailing.

To prevail under the cat's paw theory, the plaintiff acknowledges that she must show that an individual harboring a discriminatory animus influenced the adverse employment action, "regardless of which individual actually sign[ed] [her] walking papers." Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir. 1998). The plaintiff maintains that a jury could conclude that multiple staff members who were involved in the school investigation and who testified against her harbored a discriminatory animus towards her, and that they influenced the Board's decision. We disagree for three reasons.

First, several of the inferences that the plaintiff argues a jury could draw to find that staff members harbored a discriminatory animus are unsupported by the record. The plaintiff claims that a jury could infer that the school investigators harbored a discriminatory animus because they added in their report sexual language to two of the statements attributed to her. She asserts that the investigators added the word "kissing" to the comment she allegedly made in reaction to seeing two female staff members hug. This contention is unsupported by the record. The investigators' notes recorded that the two staff members who reported this comment stated that the plaintiff used the words "hugging and kissing." Before the Board, these same staff members testified that the plaintiff used the words "hugging and kissing." Thus, there is no evidence in the record to support the plaintiff's claim that the investigators embellished this report by adding language to the plaintiff's comment.

---

[5] The etymological roots of this theory's name lie in a fable in which a monkey tricks a cat into reaching its paw into a fire to retrieve roasting chestnuts. Staub v. Proctor Hospital, 562 U.S. 411, 415 n.1 (2011).

Similarly, the plaintiff claims that the investigators added the word "fingers" to her comment, "I prefer two or three," stated in response to a secretary flipping the plaintiff off with her middle finger. This contention is also unsupported by the record. The investigators' report refers to the "finger comment," but it states that both the secretary and the plaintiff reported the plaintiff stating, "I prefer two or three." Furthermore, at the Board hearing, one of the investigators referred to the "two and three fingers" comment, and then immediately corrected herself, testifying that the plaintiff reportedly said "two or three." There is thus no evidence in the record to support the plaintiff's contention that the investigators added language to the comment, "I prefer two or three."

The plaintiff also posits that a jury could infer that the investigators' conclusions demonstrated their discriminatory animus because none of the school staff members claimed to be sexually harassed. But an explicit assertion of sexual harassment is not required by the District's policy. As we explained above, the District's policy defines sexual harassment, in part, as "conduct of a sexual nature when . . . [t]he unwelcome conduct has the purpose or effect of unreasonably interfering with a person's work performance or creating an intimidating, hostile, or offensive working environment." It does not mandate that a complainant make an explicit accusation of sexual harassment or a hostile work environment.

Multiple staff members told the investigators and testified to the Board about the unwelcome nature of the plaintiff's comments, facts from which the investigators and the Board concluded that the comments created an offensive environment. There is thus no evidence in the record to support an inference that the investigators harbored a discriminatory animus because the staff members did not explicitly say they were sexually harassed. See Ameen, 777 F.3d at 68 (noting that summary judgment is appropriate in employment discrimination cases where the plaintiff rests upon "unsupported speculation" (quotation omitted)).

The plaintiff also argues that a jury could infer that a discriminatory animus motivated her termination because her sexual comment during the handcuff incident was reported while no heterosexual female staff member was reported for being "inappropriate." The record shows that one staff member perceived that the group present at the handcuff incident could be "inappropriate" when "blowing off steam" and "joking around." However, the plaintiff does not point to any evidence in the record which suggests that a heterosexual female employee present during this incident made comments of a sexual nature but was not disciplined. See Ray v. Ropes & Gray LLP, 799 F.3d 99, 114 (1st Cir. 2015) (noting that while a plaintiff may make a showing of discrimination by pointing to similarly situated employees who were treated differently, the compared employees must "closely resemble one another in respect to relevant facts and circumstances" (quotation omitted)).

Second, in reaching its decision, the Board did not rely upon the testimony of certain staff members the plaintiff identifies as allegedly harboring a discriminatory animus. As other courts have reasoned, when a neutral decision-maker makes an adverse employment decision independent of, and without relying solely on the report of, a supervisor or co-worker with an alleged discriminatory animus, the nexus between the alleged animus and the adverse employment action may be broken. See, e.g., Woods v. City of Berwyn, 803 F.3d 865, 870-71 (7th Cir. 2015) (concluding that the "chain of causation" between a supervisor's purported discriminatory animus and an employee's termination was broken because, in part, a review board held a hearing in which it did not rely solely on the purportedly discriminatory supervisor's report); Mole v. University of Massachusetts, 814 N.E.2d 329, 345 (Mass. 2004) (noting that no evidence showed that the final decision-maker was the conduit for two supervisors' alleged retaliatory animus when the final decision-maker conducted an independent proceeding at which he heard testimony from the adversely affected employee and from staff members who had no allegedly retaliatory animus).

The plaintiff submits that a jury could infer that the Board's decision was infected by several witnesses' alleged discriminatory animus because they spoke with one another before the hearing and subsequently tailored their testimony or testified inaccurately based upon these conversations. To the contrary, the record reflects that the witnesses' testimony to the Board aligned with their descriptions of the incidents to the investigators. The record contains a single instance where an inference could be drawn that a witness was influenced by conversations prior to the Board hearing. One staff member told the investigators that, during the handcuff incident, she had heard the plaintiff make a sexual comment. Yet she testified before the Board that the plaintiff had made a sexual noise. The record shows that another staff member told the investigators that the plaintiff made a sexual noise during the handcuff incident. The Board, however, credited other witnesses who substantiated this allegation. According to the Board's written decision, the plaintiff herself acknowledged making a comment with a sexual connotation. There is thus insufficient evidence from which a jury could conclude that the Board was influenced by the witness who may have changed her testimony as a result of conversations that took place prior to the Board hearing.

The plaintiff also posits that a jury could conclude that a staff member's interpretation of the comment, "I don't do straight," was intended to cover up that staff member's discriminatory bias. That staff member testified to the Board that she found this comment inappropriate for a school front office that is open to the public. Similarly, the plaintiff claims a jury could find that a discriminatory animus caused one of the investigators to testify that the plaintiff was "grooming" staff members. However, even assuming that this testimony implies a discriminatory animus, the record reflects that the Board did not credit either witness to substantiate the allegations of sexual

harassment against the plaintiff.  In fact, the Board credited the plaintiff over the other witnesses in finding that the "I don't do straight" comment did not violate the District's policies.  There is thus insufficient evidence from which a jury could conclude that the assumed animus of these witnesses influenced the Board's decision.  See Woods, 803 F.3d at 871.

Viewing the evidence in the light most favorable to the plaintiff, an inference can be drawn that two school staff members, whom the plaintiff charges with harboring a discriminatory animus towards her, disliked her and expressed their dislike through unprofessional behavior.  At the Board hearing, the plaintiff's secretary testified that she believed that the plaintiff was "incompetent" just two weeks into the school year.  The dean to whom the allegations of sexual harassment were first reported also testified that her working relationship with the plaintiff was "disconnected" and that it is possible she gave the plaintiff a "stink face."  The record, however, shows that the Board did not credit either witness's testimony in making its findings in support of the plaintiff's termination.  Therefore, even assuming that a jury could infer that these two staff members harbored a discriminatory animus, there is insufficient evidence from which a jury could find that their animus affected the Board's decision.  See Vasquez v. Empress Ambulance Service, Inc., 835 F.3d 267, 275 (2d Cir. 2016) (explaining that, under the cat's paw theory, "a biased non-decisionmaker" is required to "play a 'meaningful role' in an adverse employment decision for the unbiased decisionmaker to be culpable").

Third, our conclusion that the Board's decision was not infected by any assumed animus of certain staff members is buttressed by the thoroughness of the Board's hearing.  See Woods, 803 F.3d at 870 (concluding that a board's hearing broke the chain of causation, in part, because the hearing included "attorneys, . . . closing arguments, direct and cross-examination of witnesses, including [the terminated employee], objections and the introduction of evidence").  The Board held a three-night hearing, at which it heard testimony from thirteen witnesses and received evidence from both sides.  Counsel for the Board considered and ruled on objections raised by the attorneys for both sides.  At the hearing, the plaintiff was represented by counsel, who cross-examined the District's witnesses and presented the Board with a closing argument.  Furthermore, the plaintiff had the opportunity to testify and to explain her version of events.  The Board credited, in part, the testimony of the staff members who accused the plaintiff, including the plaintiff's own witness, in substantiating six of the allegations.  But it also credited the plaintiff's testimony in deciding that two of the allegations lodged against her were unfounded, demonstrating its independence from the conclusions drawn in the school-level report and from the testimony of the staff members.  Based upon the record before us, there is insufficient evidence from which a jury could find that certain witnesses harbored a discriminatory animus towards the plaintiff,

10

or that other witnesses with an assumed animus sufficiently influenced the Board's decision such that their assumed animus can be imputed to the Board.

## B. The "Sham" Investigation Argument

The plaintiff next argues that a jury could conclude that sexual harassment was a pretext for sexual orientation discrimination because the school investigators conducted a "sham" investigation and failed to apply the District's sexual harassment policy to the evidence. A stated reason for an adverse employment decision may be revealed to be a pretext through an improper investigation, by showing that those conducting the investigation fabricated, ignored, or misrepresented the evidence, or that the outcome was predetermined. Harden v. Marion County Sheriff's Dept., 799 F.3d 857, 864 (7th Cir. 2015).

In support of her argument that the investigation was a sham, the plaintiff claims that the staff members did not adhere to the required process for reporting claims of sexual harassment. The record reflects that the reporting process was not precisely followed because the school's principal was unavailable or on vacation when the allegations first came to light. Any deviation in the reporting process, however, does not support an inference that the District's sexual harassment finding was pretextual. The plaintiff also claims that the dean to whom the allegations were first made conducted her own investigation before informing her superiors or writing a formal summary. But the record reflects that staff members simply approached the dean to report their concerns, not that the dean conducted her own investigation.

The plaintiff also asserts that the investigation was a sham because the determination that she had engaged in sexual harassment was predetermined by the dean before she spoke with the plaintiff or before an investigation was initiated. This assertion is unsupported by the record. The initial summary of the allegations that the dean and principal gave to the superintendent merely recounted several comments that the plaintiff allegedly made to staff members during the school day. Additionally, the dean testified before the Board that she had "a duty to report any allegations of sexual harassment." (Emphasis added.) There is thus no evidence to support the inference that the outcome of the investigation was predetermined by the dean.

The plaintiff also claims that the investigators made an unfounded claim of retaliation against her in order to "bolster" their case because of her sexual orientation. Even assuming that the investigators sought to use the plaintiff's alleged retaliation as a pretext for discrimination, however, the Board independently rejected the investigators' conclusion by crediting the plaintiff's testimony over the testimony of other witnesses, and found that the plaintiff did not act in a retaliatory manner. Furthermore, the Board did not credit the testimony of the investigators in substantiating any of the allegations.

11

The plaintiff also submits that the investigation was a sham because the staff members spoke with each other before making statements to the investigators, the investigators credited staff members who were their friends, the investigators did not assess the staff members' credibility, and the investigators failed to ask the plaintiff about some of the allegations. In an effort to connect these perceived illegitimacies with the Board's decision, the plaintiff points to the fact that the investigators' report was disseminated to all of the District's witnesses prior to the Board's hearing. Yet the plaintiff identifies no evidence that this procedural irregularity influenced the witnesses' testimony before the Board. As we discussed above, the record reflects that the staff members' descriptions of the allegations to the investigators were essentially the same as their testimony to the Board. Also, the plaintiff testified to the Board, affording her an opportunity to explain her version of events, and her counsel questioned the investigators about their procedures in an effort to impugn their credibility. The plaintiff's counsel also challenged, through cross-examination, the credibility of the witnesses who made allegations against her. There is thus insufficient evidence from which a jury could conclude that the advance dissemination of the school investigators' report influenced the Board's decision.

The plaintiff cites Mastro v. Potomac Electric Power Co., 447 F.3d 843 (D.C. Cir. 2006), as support for her argument that the perceived problems with the investigation could allow a jury to find in her favor. The court in Mastro noted an "inexplicably unfair" investigation as one factor from which a jury could conclude that the employer's stated reason for firing the employee was a pretext. Id. at 855. The final decision-makers in that case relied "solely" on the "one-sided investigation." Id. at 856. The investigator in Mastro did not interview the adversely affected employee, was one of three individuals who comprised the group that rendered the adverse employment decision, and neither he nor the other decision-makers assessed the credibility of the employee whose accusation was central to the adverse employment decision. Id. at 849, 855-56.

Here, by contrast, the investigators interviewed the plaintiff, affording her a chance to explain her version of the events. Although the investigators did not ask her about certain allegations, the plaintiff testified about each allegation before the Board. Additionally, the investigators were not members of the Board, which was the final decision-maker. Although the Board acted on the recommendation of the superintendent, who relied on the investigators' report, the Board did not rely solely on that report, but instead conducted a three-night hearing before reaching its decision. Cf. id. at 856. There is thus insufficient evidence from which a jury could infer that the District's finding of sexual harassment was a pretext.

## IV. Conclusion

For the reasons stated above, we affirm the trial court's order granting summary judgment to the District on the plaintiff's discrimination claim.

<u>Affirmed</u>.

HICKS, BASSETT, and HANTZ MARCONI, JJ., concurred.